UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

Case No. 6:15-bk-01397-CCJ
Chapter 7

IN RE:

JAIME RODRIGUEZ & MARIA CELESTE RODRIGUEZ,

     Debtors.

_____/

DIANE MAHONY and JOHN MAHONY,

     Plaintiffs,

vs.                                                      Adversary Proceeding

JAIME RODRIGUEZ and MARIA RODRIGUEZ,        No.  6:15-00038-CCJ

     Defendants.

_____/

**<u>PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiffs, DIANE MAHONY and JOHN MAHONY, pursuant to Fed. R. Bankr. P. 7056 and Fed. R. Civ. P. 56, request the Court to enter an order deeming the state court fraudulent misrepresentation judgment Plaintiffs obtained against Defendants to be nondischargeable as there is no genuine dispute of material fact and as Plaintiffs are entitled to judgment as a matter of law.  In support thereof, Plaintiffs state as follows:

**<u>INTRODUCTION</u>**

Plaintiffs filed a one-count Amended Complaint in the 9th Judicial Circuit in and for Orange County, Florida, for fraudulent misrepresentation premised upon Defendants' failure to disclose certain conditions materially affecting the value of a home at the time of its sale.  *A copy of Plaintiff's Amended Complaint is attached hereto as Exhibit "A."*  The jury was instructed on

all of the elements of fraudulent misrepresentation and returned a verdict in favor of the Plaintiffs. *A copy of the jury's verdict is attached hereto as Exhibit "B."* The jury's verdict was reduced to a final judgment, a copy of which is attached hereto as Exhibit "C."[1]

Following Plaintiffs' attempt to collect on the judgment ("Debt"), Defendants filed for Chapter 7 bankruptcy protection and, in response, Plaintiffs initiated the instant adversary proceeding seeking to have the Debt determined to be nondischargeable under 11 U.S.C. § 523(a)(2)(A). Plaintiffs contend that they are entitled to summary judgment as there is no genuine dispute of material fact and as Plaintiffs are entitled to judgment as a matter of law.

## STATEMENT OF UNDISPUTED FACTS

1.     Plaintiffs filed an Amended Complaint seeking damages from the Defendants based upon fraudulent misrepresentations they made concerning the condition of the home that was the subject matter of the sale giving rise to the state court action. *Exhibit "A."*

2.     The case was ultimately tried on July 28-30, 2014. *See Trial Transcripts, Volumes I-IV.*

3.     The trial court's preliminary instruction to the jury about the issues for its determination were as follows:

> The issues for you to decide on the plaintiffs' claim for fraudulent misrepresentation are, first, whether defendants made a false statement concerning a material fact; second, whether the defendants knew the statement was false; third, whether defendants intended that another would rely on the false statement; fourth, whether the plaintiffs relied upon the false statement; and, if so, fifth, whether the false statement was a legal cause of damage to the plaintiffs.
>
> The plaintiffs may rely on a false statement even thought its falsity could have been discovered if the plaintiffs made an investigation.

---

[1] The trial court also found that Plaintiffs were entitled an award of attorney's fees but the amount of fees has not yet been determined because of the bankruptcy stay.

> However, the plaintiffs may not rely on a false statement if they
> knew it was false or its falsity was obvious to them.

*Trial Transcript, Vol. I., pages 14-15.*

4.     Plaintiff, John Mahony, testified that he purchased the home owned by the Rodriguezes in a short sale. *Trial Transcript, Vol. I, page 47.*   The purchase price was paid as a cash transaction. *Trial Transcript, Vol. I, page 48.*   There was a secondary agreement with the Defendants whereby Plaintiffs would pay, and did pay, $50,000 to Defendants so that they would not "strip the home" prior to closing on its sale. *Trial Transcript, Vol. I, pages 49-50.*

5.     The contract for sale contained a clause that said, "Seller knows of no facts materially affecting the value of the real property, which are not readily observable and which have not been disclosed to the buyer." *Trial Transcript, Vol. I., page 48.*   The contract language also contained a cautionary statement of "Notice to buyer and seller, in Florida, a seller is obligated by law to disclose to a buyer all known facts that materially affect the value of the property being sold and that are not readily observable." *Trial Transcript, Vol. I., page 51.*

6.     The only issue disclosed to Plaintiffs was the mention of a "small roof leak." *Trial Transcript, Vol. I, page 51.*   There were no other disclosures. *Trial Transcript, Vol. I., page 51.*

7.     After the contract was executed, Plaintiff, JOHN MAHONY, walked through the house with Defendant, JAIME RODRIGUEZ, at which point JOHN MAHONY asked about the roof leak. *Trial Transcript, Vol. I, pages 51-52.*   Defendant, JAIME RODRIGUEZ, a certified residential contractor (*Trial Transcript, Vol. II, pages 113-114*), advised Plaintiff, JOHN MAHONY, that the small roof leak was repaired and that the corner of the bedroom with the prior roof leak had a cosmetic defect that went unrepaired because nobody lived in the room. *Trial Transcript, Vol. I, pages 52, 60.*

8.      Mr. Rodriguez then advised Plaintiff that there was once a balcony leak into a room that "had been thoroughly repaired" but that the cosmetic finishing repairs were not completed. *Trial Transcript, Vol. I., pages 52-53*. Mr. Rodriguez advised that a broom should be kept handy to push some water off the balconies after it rained. *Trial Transcript, Vol. I, page 57*. Mr. Mahony pointed out some swollen wood on the French Doors and Mr. Rodriguez advised it was just a "cosmetic issue." *Trial Transcript, Vol. II, page 171*.

9.      Mr. Mahony testified that Jaime Rodriguez advised him that "he was a certified contractor and had been a [home] builder, you know, over and over, repeated that, you know, he had built the home, and he had lived in the home, and if there was an issue he would know about it." *Trial Transcript, Vol. I., page 61*.

10.     Mr. Mahony testified that he relied upon Mr. Rodriguez's representations about the condition of the home.  He stated: "That was a huge – that was huge selling point of the fact that we were purchasing the home from a builder, not only that, but a builder that, you know, not only built the home that he lived in, since that, you, initial time and he assured me, hey, if there was an issue with this house, you know, I was going to take care of it, I'm living in the house." *Trial Transcript, Vol. I., page 62*.

11.     After the closing on the home, Plaintiffs discovered extensive damage throughout: black mold on the back of the drywall in the baby's room (*Trial Transcript, Vol. I, pages 63-64)*; water damaged wood (*Trial Transcript, Vol. I., page 65*); the entire ceiling in the baby's room needed to be replaced (*Trial Transcript, Vol. I, page 65*); and most of the flooring and the walls had to be replaced (*Trial Transcript, Vol. I, page 66)*.

12.     Subsequently, Plaintiffs noticed tremendous water damage to the decks that was anything but cosmetic. Mr. Mahony testified: "The entire deck had to be completely ripped apart

as well as this overlook of the garage, the whole ceiling in the garage had to be torn apart as well as some of the pillars that hold up, you know, they're in between and then the floor on the actual balcony." *Trial Transcript, Vol. I, page 66.* He stated that there was "so much water accumulation and damage that it just started seeping into the actual structure of the house into the walls of the – anything that was adjacent to the actually balcony that started seeping in damage, and the water that was accumulated here, both flowing down into the garage, and it was also flowing into the flooring in the walls of this bedroom, that was it, it was like a double combo because were also getting the leakage from the roof coming into that room." *Trial Transcript, Vol. I., pages 66-67.*

13.     There was so much balcony damage that a worker stepped out on the balcony and his foot went right through the deck. *Trial Transcript, Vol. I, page 68.* He testified that Larry Smith (a handyman) was "a little bit heavier-set gentleman, so he was just bearing his weight, and he literally went right through the tile which was a huge shock, that's when I thought, well, we've got some real issues here." *Trial Transcript, Vol. II, 170-171.*

14.     As a result, the balcony and the ceiling below had to be completely destroyed and rebuilt. *Trial Transcript, Vol. I., page 69.*

15.     Mr. Mahony testified that: "Once we uncovered and realized that there really hadn't been any repairs done to the second floor balcony and we uncovered that there was more here than just not finishing a cosmetic issue, we soon realized that pretty much the entire garage had to be redone including, you know, the entire ceiling, all of the walls." *Trial Transcript, Vol. I, page 73.* He also stated that there was a lot of damaged wood as well. *Trial Transcript, Vol. I, page 73.*

16.     Mr. Mahony testified that Defendant, Jaime Rodriguez, told him that the only problems with the house were cosmetic. *Trial Transcript, Vol. I, page 77.* Mr. Mahony then stated that he relied on those representations "Because I actually would take the word of a certified builder over an inspector.   I assumed the fact that he was a, you know, certified contractor or certified builder that he knew what he was talking about.  He did a real good job of assuring me that he knew the house inside and out." *Trial Transcript, Vol. I, page 77.*

17.     The total amount expended by Plaintiffs repairing the home were $82,888.60. *Trial Transcript, Vol. I, page 77.*  The Mahonys paid those expenses.  *Trial Transcript, Vol. I, page 77.*

18.     The Mahonys paid $560,000, in cash, to the Rodriguezes to purchase the home. *Trial Transcript, Vol. I, page 82 (Cross Examination by Defendants' counsel).*

19.     John Mahony testified that both Rodriguezes made the representations that any problems with the home were cosmetic in nature. *Trial Transcript, Vol. I, page 95.*  He further testified that he was never told that there was anything structurally unsound with the home; that there was no damage to the balconies; that there was no damage to the subflooring in the garage and that there was no damage to the interior of the home.  *Trial Transcript, Vol. I, page 96.*

20.     Rick Edren[2] testified that he was a licensed mold assessor with the capability of looking for water intrusion points.   *Trial Transcript, Vol. II, page 7.*  Mr. Edgren was also a licensed mold remediator who could remove moldy material, take it from the site, and clean contaminated areas with biocides.  *Trial Transcript, Vol. II, page 8.*

---

[2] The witness's correct name is Rick Edgren, but the transcript refers to him as "Edren."

21.    Mr. Edgren testified that a commercial residential contractor, like Jaime Rodriguez, was in a better position to assess damage to structural materials like the quality of decks as opposed to a home inspector.  *Trial Transcript, Vol. II, pages 9-10.*

22.    Mr. Edgren testified that the balconies to the home were negatively sloped causing water to run along the walls of the upper decks; that the substrate underneath the tile flooring was soft; that there was a lot of water staining on the garage ceiling; and that there were stains along other walls in the upstairs along with toxic mold in the air.  *Trial Transcript, Vol. II, page 11.*  The poor sloping on the decks caused the water to flow back and intrude into the home.  *Trial Transcript, Vol. II, page 19.*

23.    He tested the walls of the upstairs bedroom and found that there was active moisture into the walls of the home.  *Trial Transcript, Vol. II, page 14.*  He testified that there was mold throughout the entire home—some of which was due to long-term moisture problems.  *Trial Transcript, Vol. II, pages 14-15.*  He described the damage to the studs in the walls "were just crumbling, they were falling apart, they had a lot of water damage and dry rot.  That had water intrusion all the time."  *Trial Transcript, Vol. II, page 15.*

24.    Mr. Edgren then described water intrusion throughout the balconies that was wicking up the walls that was present for a long time.  *Trial Transcript, Vol. II, page 16.*  He described the balconies as being structurally unsound with evidence of long-term water intrusion.  As a result, the decks had to be "ripped out."  *Trial Transcript, Vol. II, page 17-18.*  In fact, the decks were demolished and had to be rebuilt.  *Trial Transcript, Vol. II, pages 27-28.*

24.    On cross examination, counsel for the Rodriguezes asked questions about whether it was critical for a home inspection to occur prior to the purchase of a home.  Mr. Edgren

agreed. *Trial Transcript, Vol. II, pages 38-39.* He testified that he was aware that the Mahonys did not have a home inspection prior to closing on the home. *Trial Transcript, Vol. II, page 39.*

25.    Mr. Edgren testified that the negative sloping of the balconies was a warning sign of water intrusion entering the home. *Trial Transcript, Vol. II, page 41.*

26.    The Rodriguezes' counsel then conducted a thorough cross examination about what a home inspector, like Mr. Edgren, would do based upon the visual inspection of the home. Mr. Edgren then gave testimony that he would have made numerous recommendations to a prospective buyer and would have expressed significant concerns over the quality of the construction. *Trial Transcript, Vol. II, pags 42-45.*

27.    Mr. Edgren then testified that a certified residential contractor would be in a better position to assess the damage to a home than a home inspector. *Trial Transcript, Vol. II, pages 47-48.*

28.    He then testified as follows:

>    Q:    If there was a representation to the Mahonys that the damage – the condition of water on the balconies was cosmetic, would that be concealing evidence of damage to the balconies?
>
>    A.    I would have to say yes.

*Trial Transcript, Vol. II, page 48.*

29.    Plaintiffs' expert, Keven Karten, then testified that a certified residential contractor can perform all construction duties on a residential project up to three stories. *Trial Transcript, Vol. II, page 52.*

30.    He testified that a certified residential contractor "most certainly" must be concerned about the possibility of water intrusion into a structure. *Trial Transcript, Vol. II, page*

*54.* The biggest concern about water intrusion is that it can damage interior finishes like drywall, woodwork and the structure. *Trial Transcript, Vol. II, pages 54-55.*

31.     Mr. Karten looked at the floor plan of the home and identified four major areas of concern—a rear covered deck, a catwalk, a bedroom and the master covered deck. *Trial Transcript, Vol. II, page 60.*

32.     He testified that the prior disclosed roof repair over the bedroom was inadequate as the work simply covered the water damaged area with drywall. He was shocked that a certified residential contractor like Mr. Rodriguez did not make sure the repair was proper. *Trial Transcript, Vol. II, page 63.*

33.     The fact that Mr. Rodriguez represented to the Mahonys that some tiles needed to be re-leveled and re-grouted was evidence that "the damage that occurred beneath this floor was extensive, and the methods taken of sealing and grouting were not correct." He felt that a certified residential contractor would know that further investigation was required. *Trial Transcript, Vol. II, page 65.* In fact, a certified residential contractor should "100 percent" know that there was evidence of damage to the substrate floor underneath the deck. *Trial Transcript, Vol. II, page 65.*

34.     When asked why would a certified residential contractor know of the damage, he testified that "In order to receive a CRC, certified residential . . . you have to have experience in the field, you have to have experience in construction. This is merely an obvious defect that has been concealed." *Trial Transcript, Vol. II, page 65.*

35.     Mr. Karten testified that the deck damage was severe and that water intrusion was hidden and concealed. He testified that a certified residential contractor "100 percent" should have known about the damage. *Trial Transcript, Vol. II, page 66.*

36.    He testified that he "fully" believed that Mr. Rodriguez knew about the damage but did not fully disclose it.  *Trial Transcript, Vol. II, page 66.*

37.    Mr. Karten testified that the roof leak and deck water intrusion into the bedroom migrated downward and affected the garage.  *Trial Transcript, Vol. II, page 70.*  The repair made by Mr. Rodriguez was to replace wet drywall with new drywall. *Trial Transcript, Vol. II, pages 70-71.*  The garage damage was indicative of water damage coming from the second story decks. *Trial Transcript, Vol. II, page 72.*  A certified residential contractor would have known this. *Trial Transcript, Vol. II, pages 72-73.*

38.    Mr. Karten then identified calcium build up and evidence of water intrusion into the decks.  This damage was "significant."  *Trial Transcript, Vol. II, page 74-75.*  The damage showed there to be extensive rotted structural lumber.  *Trial Transcript, Vol. II, page 75.*  He testified that there was "no doubt about it" that a certified residential contractor would have knowledge about this wood rot.  *Trial Transcript, Vol. II, page 75.*

39.    He next described the damage to the catwalk as "significant as the other balconies, water intrusion, soft spots, comments that it was severely rotted."  *Trial Transcript, Vol. II, page 76.*

40.    This rotting occurred over a period of years and there would have been evidence of same prior to the time that it completely rotted out.  *Trial Transcript, Vol. II, page 77.*  This would have been apparent to a certified residential contractor.  *Trial Transcript, Vol. II, page 77.*

41.    Mr. Karten testified as follows:

> Q:    Does the objective evidence support the fact that somebody in the construction trade, like yourself, would have knowledge of the existence of serious problems with this home?

> A.      There's no doubt that a construction trade specialist was aware of the damage occurred.

*Trial Transcript, Vol. II, page 78.*

42.      Mrs. Rodriguez testified that she is the vice president of JXR Construction; that the company builds homes; that Mr. Rodriguez was a home builder; and that he was a certified residential contractor.  *Trial Transcript, Vol. II,* page *81.*

43.      She was aware of a roof leak in the guest bedroom.  *Trial Transcript, Vol. II, page 81.*

44.      Mrs. Rodriguez signed the seller's real property disclosure.  *Trial Transcript, Vol. II., page 85.*

45.      Mrs. Rodriguez lived in the home for a period of years and had seen standing water on the balconies.  *Trial Transcript, Vol. II, page 86.*  She was aware that water had to be "broomed" off the balconies.  *Trial Transcript, Vol. II, page 86.*  She never told the Mahonys that there was standing water on the balconies and she never disclosed it in the real property disclosure.  *Trial Transcript, Vol. II, page 87.*

46.      Mr. Rodriguez is a certified residential contractor and he builds homes.  *Trial Transcript, Vol. II, pages 113-114.*  He is familiar with the Florida Building Code.  *Trial Transcript, Vol. II, page 116.*

47.      Mr. Rodriguez knew, as a certified residential contractor, that it was important for the building envelope to be dry.  *Trial Transcript, Vol. II, page 120.*  He could think of no reason why a certified residential contractor would want water to flow back into the home.  *Trial Transcript, Vol. II, page 120.*

48.      As a certified residential contractor, he learned about waterproofing and that a builder would not want water to penetrate into a building.  *Trial Transcript, Vol. II, page 120.*

He knew that the Florida Building Code required that decks slope 1/8" per foot away from the building toward the edge of the balcony. *Trial Transcript, Vol. II, page 121.* He knew that negative sloping toward the home is disallowed by the Florida Building Code. *Trial Transcript, Vol. II, page 121.* He knew that the reason for sloping away from the building envelope was to avoid water penetration into the home. *Trial Transcript, Vol. II, page 121.*

49.     Mr. Rodriguez acknowledged telling Plaintiffs that there were low spots on the decks but that "I had no problems with leaks through those decks or drywall getting wet." *Trial Transcript, Vol. II, page 130.* He agreed that he told them to push water off the balcony when it rained. *Trial Transcript, Vol. II, page 130.*

50.     Mr. Rodriguez testified that he did not disclose the issues with the decks in the seller's real property disclosure statement. *Trial Transcript, Vol. II, page 134.* He knew, as a certified residential contractor, that the decks were not constructed appropriately. *Trial Transcript, Vol. II, page 136.*

51.     When asked by Defendants' counsel if there was a concern with the balconies, Mr. Mahony testified that Mr. Rodriguez said: "hey, you know, I apologize, I never got around to the cosmetic nature of the problem, but I can assure you that everything in between the drywall and the balcony, everything's been replaced. And I took him at his word, being a certified residential contractor, I believed what he was telling me." *Trial Transcript, Vol. II, page 173.*

52.     Defendants' counsel then asked if the problem with the balconies was enough to change the Mahonys' offer on the home and Mr. Mahony testified:

> No.   Once again, Jaime had, you known, just reassured me that
> everything's been repaired here.  There's nothing to be concerned
> about.  [Referring to what Mr. Rodriguez said] It's not like I live
> far away, and, you know, if there's any issues, let me know, but I

can assure you that everything has been fixed, and, yeah, it was really to the point, come to find out that really none of it has been fixed. You know, obviously, not the cosmetic aspect or any other aspects, that's why we're here now.

*Trial Transcript, Vol. II, page 173.*

53.    Mr. Mahony noted a problem with the roof leaking into the bedroom just after the first rain following the closing on the home.  *Trial Transcript, Vol. II, page 174.*

54.    When asked why the Mahonys did not get an inspection on the home, Mr. Mahony replied: "The main reason was just with my conversations with Jamie, I mean he was – he never told me to get an inspection, but, you know, when the topic came up, he said, you know, I'm a builder, I built this house . . . I build homes, and he had shown me some other work he had done in the area, I know the house inside and out, you know, my family lived here, I know there were some issue, and Jamie convinced me that, you know, the issues that had happened previously were fixed, which they weren't and I believed him." *Trial Transcript, Vol. II, pages 179-180.*  Mr. Mahony did not get an inspection because he "felt very at ease with what Jamie was telling me." *Trial Transcript, Vol. II, page 180.*

55.    The following exchange took place:

Q:    You were asked some questions about an inspection, and why you didn't get one, were you expected to assume that the Rodriguez's were lying to you?

A:    No.

Q:    Did you believe what they told you?

A:    Yes.

Q:    Did you rely upon their representation for purposes of buying the house?

A:    Yes.

*Trial Transcript, Vol. II, page 180-181.*

56.     At the charge conference, Defendants' counsel specifically agreed, without objection, to the introduction of Fla. Std. Jury Instr. (Civ.) 409.7.  *Trial Transcript, Vol. III, page 216.*

57.     Defendants' counsel specifically agreed to the contents of the verdict form.  *Trial Transcript, Vol. IV, page 8.*

58.     Defendant again consented to the introduction of Fla. Std. Jury Instr. (Civ.) 409.7 entitled "fraudulent misrepresentation."  *Trial Transcript, Vol. IV, page 23.*  Defendant again consented to the form of the verdict.  *Trial Transcript, Vol. IV, page 25.*

60.     The trial judge instructed the jury that: "The claim in this case is as follows:  The plaintiffs' claim that the defendant fraudulently misrepresented the condition of the home they sold to plaintiffs resulting in the damages sustained by plaintiffs."  *Trial Transcript, Vol. IV, page 26.*

61.     The trial judge instructed the jury as follows:

> The issue for you to decide on issues claimed for fraud and misrepresentations are: First, whether the defendant made a false statement concerning material facts. Second, whether defendants knew the statements were false. Third, whether the defendants intended that another would rely on the false statements. Fourth, whether plaintiffs relied on the false statement, and if so, fifth, whether the false statements was a legal cause of damage to plaintiffs. Plaintiffs may rely on false statements, even though its falsity could have been discovered if plaintiffs had made an investigation. However, plaintiffs may not rely on false statements if they knew it was false, or its falsity was obvious to them.

*Trial Transcript, Vol. IV, page 27.*

62.     Following closing arguments, the jury issued a verdict specifically finding that the defendants misrepresented the condition of the home. *Trial Transcript, Vol. IV, page 65.*

## ARGUMENT

## I.    THE DEBT IS NONDISCHARGEABLE UNDER 11 U.S.C. § 523(a)(2)(A).

Pursuant to 11 U.S.C. § 523(a)(2)(A), a debt is nondischargeable if it is incurred by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."  In the context of a § 523(a)(2)(A) claim, the Court is precluded from re-litigating issues previously decided in a judicial proceeding if the party against "whom the prior decision is asserted had a 'full and fair' opportunity to litigate that issue in an earlier case." *In re St. Laurent*, 991 F.2d 672 (11th Cir. 1993).  "Collateral estoppel principles apply to dischargeability proceedings." *Id. at 675.* "If the prior judgment was rendered by a state court, then the collateral estoppel law of that state must be applied to determine the judgment's preclusive effect." *Id. at 676.*

> Under Florida law, the following elements must be established before collateral estoppel may be invoked:  (1) the issue at stake must be identical to the one decided in the prior litigation; (2) the issue must have been actually litigated in the prior proceeding; (3) the prior determination of the issue must have been a critical and necessary part of the judgment in that earlier decision; and (4) the standard of proof in the prior action must have been at least as stringent as the standard of proof in the later case.

*In re St. Laurent*, 991 F.2d at 676.

### A.    The issue at stake in the instant proceeding is identical to the finding of fraudulent misrepresentation in the state court action.

In order to meet the § 523(a)(2)(A) standard for fraud, a creditor must prove that the debtor made a false representation with intent to deceive, the creditor relied upon the representation, the reliance was reasonably founded and the creditor suffered a loss due to the misrepresentation.  *In re St. Laurent*, 991 F.2d 672 (11th Cir. 1993).  "Florida common law

fraud's elements satisfy the elements of § 523(a)(2)(A)."[3]  *Accel Motorsports, Inc. v. Rosario*, 2015 WL 232427 (Bankr. M.D. Fla. 2015)(Jennemann, J.).  *Accord White v. Milich*, 2013 WL 4835102 (Bankr. S.D. Fla. 2013)(Kimball, J.).  Specifically, the trial court, without objection, gave Fla. Std. Jury Instr. (Civ.) 409.7 entitled "Fraudulent Misrepresentation" as follows:

> First, whether the defendant made a false statement concerning material facts. Second, whether defendants knew the statements were false. Third, whether the defendants intended that another would rely on the false statements. Four, whether plaintiffs relied on the false statement, and if so, fifth, whether the false statements was [sic] a legal cause of damage to plaintiffs. Plaintiffs may rely on false statements, even though its falsity could have been discovered if plaintiffs had made an investigation. However, plaintiffs may not rely on false statements if they knew it was false, or its falsity was obvious to them.

Based upon the jury instructions, the jury was asked to determine (a) whether there were false statements; (b) whether the Defendants intended that Plaintiffs rely upon the false statements; (c) whether the Plaintiffs relied upon the false statements; and (d) whether the Plaintiffs suffered damages as a result of the false statements.  Under Florida law, Fla. Std. Jury Instr. (Civ.) 409.7 contemplates that reliance upon a false statement is justified.    In *Besett v. Basnett*, 389 So. 2d 995 (Fla. 1980), the Florida Supreme Court adopted Section 540 of the Restatement (Second) of Torts (1976) as follows:

> The recipient of a fraudulent misrepresentation of fact is *justified* in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation.

*Bessett*, 389 So. 2d 995 (Fla. 1980)(Emphasis added).  This is the very reason that the jury instruction includes the language: "Plaintiffs may rely on false statements, even though its falsity could have been discovered if plaintiffs had made an investigation."  Thus, Fla. Std. Jury Instr.

---

[3] "To prove fraud under Florida law, a plaintiff must establish that the defendant made a deliberate and knowing misrepresentation designed to cause, and actually causing detrimental reliance by the plaintiff."  *In re St. Laurent*, 991 F.2d at 676.

(Civ.) 409.7, specifically includes "justifiable" reliance in its content although it does not refer to the term specifically.

Here, the testimony revealed that Jaime Rodriguez is a certified residential contractor who constructed homes and was familiar with the Florida Building Code.  The evidence showed that the only written disclosure on the Sellers' Real Property Disclosure Form was the existence of a prior roof leak; this was acknowledged by both Defendants.  When asked about the roof leak, Mr. Rodriguez advised Plaintiffs that same was fully repaired and that the only thing that was not addressed was a cosmetic issue in the corner of the room.

In a subsequent walkthrough of the home, Mr. Rodriguez advised that there was some water that needed to be swept off the balconies following a rain event.  Mrs. Rodriguez acknowledged the same issue.  However, this problem was never disclosed on the Sellers' Real Property Disclosure Form.  When questioned about this topic, Mr. Rodriguez told Mr. Mahony that the deck tiles may need to be re-leveled but that the issue was merely cosmetic in nature.  In fact, Mr. Rodriguez, as a certified residential contractor, knew this problem was anything but cosmetic.

According to the expert testimony, through Mr. Karten, and the testimony of Rick Edgren, a certified residential contractor was in a better position to assess the quality of a home when compared to a home inspector.  Mr. Karten specifically testified that a certified residential contractor like Mr. Rodriguez knew of the massive defects affecting the roof, bedroom, decks and garage and concealed them from the Mahonys.  According to Mr. Karten, there was clear evidence of the defects existing for a period of years and that a certified residential contractor like Mr. Rodriguez "100 percent" would have known of the extensive nature of the construction problems before the Mahonys discovered them.  Specifically, there was evidence of water

intrusion affecting the home that a certified residential contractor must have known about for a period of years prior to the sale to the Mahonys.

The Mahonys relied upon the representations made by the Rodriguezes that the roofing problem was fixed and that any other problems associated with the home were solely cosmetic in nature, primarily because Mr. Rodriguez represented himself as a certified residential contractor who had built the home and lived in it. As a result, the Mahonys were lulled into comfort by a certified residential contractor's representations of the existence of only cosmetic issues. Thus, the Mahonys paid $560,000 in cash for the home and an additional $50,000 to the Rodirguezes to avoid having them "strip" the home prior to the closing on the real estate transaction. The Mahonys experienced problems with the home just after the first rain event and then discovered the massive damage affecting nearly all parts of the home to the point that they had to expend in excess of $88,000 making repairs.

The jury's verdict, based upon the evidence and testimony, and the trial court's instructions on fraudulent misrepresentation (agreed to by Defendants), reflects that Plaintiffs proved all of the elements necessary to establish their claim for fraudulent misrepresentation. The jury's verdict meets the requirements of fraud necessary to establish nondischargeability pursuant to § 523(a)(2)(A). As a result, because the issue in the state court judgment is identical to the issue in the adversary proceeding, Plaintiffs have satisfied the first prong of the collateral estoppel test.

> **B.    The issue of fraudulent misrepresentation was actually litigated in the state court.**

It is indisputable that the fraudulent misrepresentation claim was actually litigated in the state court. The one count Amended Complaint was premised upon fraudulent misrepresentation; the jury was specifically instructed on fraudulent misrepresentation; and the

jury returned a verdict finding that the Defendants misrepresented the condition of the home.

      **C.**      **The prior determination of the fraudulent misrepresentation claim must have been a critical and necessary part of the judgment in that earlier decision.**

It is likewise indisputable that the fraudulent misrepresentation issue was a "critical and necessary part of the judgment in that earlier decision." In fact, the entire case revolved around Defendants' fraudulent misrepresentations. Again, there was a one count fraudulent misrepresentation claim; the issue on the main claim in the state court was fraudulent misrepresentation (Fla. Std. Jury Instr. (Civ.) 409.7); and the jury returned a verdict in Plaintiffs' favor on the fraudulent misrepresentation claim in the state court decision. As a result, Plaintiffs satisfied the third prong of the collateral estoppel analysis.

      **D.**      **The standard of proof in the prior action, e.g., a preponderance of the evidence, is identical to the standard of proof in the instant action.**

The standard of proof in Florida for fraud is "a preponderance of the greater weight of the evidence." *Wieczorek v. H&H Builders, Inc.*, 475 So. 2d 227 (Fla. 1985). *Accord Bacon & Bacon Mfg. Co., Inc. v. Bonsey Partners*, 62 So. 3d 1285 (Fla. 2d DCA 2011)(noting that Fla. Std. Jury. Instr. (Civ.) 409.2, applicable to fraudulent misrepresentation, is a "greater weight of the evidence standard"). The standard of proof for fraud in nondischargeability cases is the preponderance of evidence standard. *In re St. Laurent*, 991 F.2d 672 (11th Cir. 1993). Pursuant to *St. Laurent*, the burdens of proof are identical. As a result, Plaintiff has satisfied the fourth element for collateral estoppel.

## CONCLUSION

Having met all of the elements of Florida's collateral estoppel analysis, Plaintiffs have satisfied the requirements of issue preclusion under § 523(a)(2)(A). Thus, there is no genuine

dispute of material fact and Plaintiffs are entitled to summary judgment finding that the state court judgment is nondischargeable.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing Motion for Summary Judgment has been furnished via CM/ECF this 29th day of October 2015 to Raymond J. Rotella, Kosto & Rotella, P.A., P.O. Box 113, Orlando, FL 32802.

/s/ Brad E. Kelsky
_____
BRAD E. KELSKY, ESQ.
Counsel for Plaintiffs
KELSKY LAW, P.A.
1250 S. Pine Island Road
Suite 250
Plantation, FL 33324
954.449.1400
Fax:  954.449.8986
FBN:  0059307
Email:  bradkelsky@kelskylaw.com